IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

G'ESA KALAFI, f/k/a STANLEY FELTON,

                    Plaintiff,                              OPINION AND ORDER

          v.
                                                           Case No. 16-cv-847-slc
LEBBEUS BROWN, TIM HAINES,
CRAIG TOM, TROY HERMANS and
SHANA BECKER,

                    Defendants.

---

     In August 2011, while an inmate at the Wisconsin Secure Program Facility, G'esa Kalafi f/k/a Stanley Felton, wrote an article titled "The Psychologist Who Needs A Psychologist" and sent it to an organization that published it on the internet. In the article, Kalafi made a number of disparaging and critical remarks about defendant Shana Becker[1], who at the time was a psychological associate at the prison, and about the WSPF staff in general. In late December 2011, prison officials discovered the article on line and took steps to have it removed, but took no action against Kalafi. A few weeks later, however, Kalafi confronted Becker with the article, insisting that the things he had written about her had been true. After a cell search turned up seven copies of the article, Kalafi was charged with violating a prison rule that prohibited lying about staff. Kalafi eventually was punished with 180 days' segregation.

     In this lawsuit, Kalafi alleges that defendants Lebbeus Brown, Tim Haines, Craig Tom, Troy Hermans and Becker retaliated against him in violation of the First Amendment by issuing the conduct report and then failing to dismiss it. In addition, Kalafi claims that his hearing officer, defendant Tom, violated his right to procedural due process by acting as a biased

---

    [1] In 2015, defendant Shana Becker married defendant Craig Tom and her name is now Shana Tom. To avoid confusion, in this opinion I refer to Becker by her former name of Shana Becker, as she is named in the complaint.

decisionmaker.  Kalafi seeks injunctive relief in the form of expungement of the lying charge as well as compensatory and punitive damages.

Both sides have filed motions for summary judgment.  Dkts. 43, 49.  I am granting Kalafi's motion for summary judgment on his First Amendment retaliation claim (and denying defendants' cross-motion) because defendants violated Kalafi's First Amendment rights when they punished him for the statements he made in the article.  Under *Procunier v. Martinez*, 416 U.S. 396, 413 (1974), Kalafi's statements were protected even if they were defamatory or false, and defendants have failed to show that punishing Kalafi for making the statements was a response no greater than necessary to further the prison's interest in security, order or rehabilitation.

I am denying Kalafi's motion for summary judgment and granting defendants' cross-motion on Kalafi's due process claim because Kalafi has failed to adduce evidence sufficient for a reasonable jury to conclude that Tom actually abdicated his role as a neutral decisionmaker.

As a result, all that remains for trial is the question of Kalafi's claimed damages on the First Amendment violation.  I am requiring Kalafi to submit a pretrial proffer of his evidence on actual damages and punitive damages so that the court can tailor the parameters of this trial.

FACTS

From the parties' proposed findings of fact, I find the following facts to be undisputed for the purposes of deciding the motion for summary judgment:

Plaintiff Stanley Lee Felton a/k/a G'esa Semedi Kalafi has identified himself in this matter as  G'esa Kalafi f/n/a/ Stanley Felton.  At all times relevant to his complaint, he was incarcerated at the Wisconsin Secure Program Facility ("WSPF") in Boscobel, Wisconsin, and the defendants were employed at WSPF in various capacities.

In August 2011, Kalafi wrote an article titled "The Psychologist Who Needs a Psychologist" and sent it to an organization called Between the Bars, which operates a website that posts articles written by inmates. Dkt. 46, exh.1. Kalafi included with his article a victim impact statement written by defendant Shana Becker, who was a psychological associate at WSPF. Becker had written her statement for the Grant County District Attorney's office for a circuit court matter involving another inmate at WSPF who had made sexually inappropriate remarks to her both in writing and in person.

In his article, Kalafi referred to Becker by her full name and included several quotes from her victim impact statement. After quoting Becker's statements regarding how she had been negatively affected by the other inmate's behavior, Kalafi wrote: "The way [Becker] explains the psychological effects the prison inmates has had on her sounds like she's incompetent for the job, to be fair, to actually give an accurate assessment on a prisoners mental problems, when she seems to be suffering herself." Kalafi went on:

> The major problem with Dr. [Becker] and staff like her, having the problems she's alleging in her letter, actually causes her to give inaccurate assessments on an inmates mental state, or any at all out of anger, frustration, vindictiveness or just being plain tired of the type of inmates she's described in her letter, or similar acts. This would cause mentally ill prisoners to be at WSPF when they are not suppose to be. There is no doubt in this writers mind WSPF psychologist give inadequate psychological records, moreover, keeping in mind these psychologist work for WSPF, a place that has an "interest" in keeping certain prisoners in their prison, in administrative confinement or just in segregation status, and these so-called doctors help WSPF by not acknowledging the clear mental problems of these prisoners who may need treatment, not 24 hour confinement.

Dkt. 46, exh.1, at 3-4.

Between the Bars published the article on its website, where, on or around December 19, 2011, it was noticed by defendant Lebbeus Brown. Brown was a captain and the Security Threat Groups Coordinator at WSPF. After seeing the article, Brown notified Dr. Stacy Hoem, the most senior licensed psychologist at the institution, who in turn notified Becker. Becker was dismayed to learn that her victim impact statement had not remained confidential and that the inmate who she was writing about had shared it with other inmates at the prison. (Becker's understanding was that the victim impact statement would be seen only by the presiding circuit court judge and would remain confidential.) Becker also was disturbed by Kalafi's article because in her view, he had used quotes taken out of context from her victim impact statement to misinterpret what she had written.

Becker completed an incident report so that the institution could take action to have the article removed from the internet. Becker did not talk to Kalafi about the article at that time, nor was she aware whether staff had searched Kalafi's cell. Neither Brown, Becker nor anyone else at the institution took any disciplinary action against Kalafi at that time.

A little less than a month later, on January 13, 2012, Becker was on Kalafi's unit speaking with another inmate, Karry Hilley, at around 3 p.m. Becker did not provide regular mental health treatment to Kalafi, but spoke with him occasionally during rounds. According to Kalafi, after concluding her visit with Hilley, Becker stopped at Kalafi's cell and said, "I didn't like that article you wrote." Kalafi, who happened to have a copy of the article on his bed, grabbed it and handed it to Becker, stating, "What don't you like about the truth? I based it off what you

yourself wrote." Becker handed the article back to Kalafi and said, "You won't get away with posting this." Becker then walked away.[2]

Based on her cell-front interaction with Kalafi, Becker believed that Kalafi possessed actual copies of the victim impact statement. Because it was Becker's understanding that this statement was to remain confidential and was to be possessed only by the District Attorney's Office, Becker believed that Kalafi's possession of the statement amounted to possession of contraband. Becker notified security staff that Kalafi might have contraband in his cell.

At 3:05 p.m., that same day, defendant Craig Tom ordered Kalafi out of his cell for a cell search and strip search. Dkt. 58-1, at 2. Tom was the lieutenant on duty that day; as it happens, he also was dating Becker.[3] Seven copies of the Behind Bars article were found in Kalafi's cell.[4]

---

[2] Becker has a different version of events. Becker says that Kalafi stopped her as she was walking past his cell after visiting Hilley, showed her copies of the article and her victim impact statement and asked her how she had felt when she saw the article. This dispute is immaterial. No matter who initiated the conversation, there is no evidence to show that Kalafi was disciplined because of his interaction with Becker, as opposed to being disciplined for having written and published the article.

[3] Kalafi says that Becker went directly to Tom and asked him to order the search of Kalafi's cell. Kalafi has no foundation for this assertion. Becker cannot recall which member of the security team she notified about Kalafi having contraband in his cell, but she does not think it was Tom. Although Tom authorized the search, he has no recollection of who asked him to order the search; normally, when there is a need to conduct a "for cause" cell search or strip search of an inmate, a unit sergeant or officer seeks permission from a supervising officer or unit manager. In any case, even if Becker did contact Tom and notify him that Kalafi had contraband, it is undisputed that Tom has no recollection of being notified of the results of the search and that neither he nor Becker issued a conduct report against Kalafi.

[4] According to defendants, seven copies of Becker's victim impact statement also were found in Kalafi's cell. Kalafi denies that he had any copies and insists that defendants' records showing otherwise were fabricated. This dispute is immaterial because defendants are not contending that Kalafi was disciplined for possessing copies of the victim impact statement. It is undisputed, however, that Becker thought she saw copies of her statement in Kalafi's cell and she believed that his possession of it was inappropriate.

Neither Becker nor Tom issued a conduct report against Kalafi and they did not ask anyone else to do so.

The items removed from Kalafi's cell were routed to defendant Brown. Brown, a former investigations captain, was tasked at WSPF with reviewing most of the written material confiscated from inmates' cells. On February 28, 2012, Brown issued a conduct report against Kalafi charging him with violating Department of Corrections' Rule 303.271, "Lying about staff." Pursuant to DOC Rule 303.271, an inmate may be found guilty of lying about staff when he makes "a false written or oral statement about a staff member which may affect the integrity, safety or security of the institution or staff, and makes that false statement outside the complaint review system[.]"

Brown issued the conduct report based on statements Kalafi had made in his article. Brown wrote that "Inmate Felton wrote and had the article posted on the internet blog Between the Bars" and that it had been done "outside the Inmate Complaint Review System" to affect Becker's integrity. Adult Conduct Report, dkt. 46-10. Specifically, Brown identified three statements in Kalafi's article that he found objectionable:

> (1) The way Dr. SBL [Shana Becker] explain the psychological effects the prison inmates has had on her sounds like she's incompetent for the job, to be fair, to actually give an accurate assessment on a prisoners mental problems, (when she seems to be suffering herself).
>
> (2) There is no doubt in this writers mind WSPF psychologist give inadequate psychological records, moreover, keeping in mind these psychologists work for WSPF, a place that has an "interest" in keeping certain prisoners in their prison, in administrative confinement or just in segregation status, and these so-called doctors help WSPF by not acknowledging the clear mental problems of these prisoners who may need treatment, not 24 hour confinement.

(3) On behalf of the mentally ill this writer would like to thank the good, loving, caring WSPF health officials and all those in cahoots with them, for a wonderful job and if there is a God may this powerful force damn you all to hell for eternity.

*Id.*

Brown did not provide any reason for concluding these statements were false.[5] Brown noted that seven copies of the article had been found in Kalafi's cell "to send out." *Id.* Other than issuing the conduct report, Brown had no further involvement with Kalafi's discipline.

Jerome Sweeney, WSPF's security director, reviewed the conduct report and allowed it to proceed as a major offense. Kalafi requested a hearing and the hearing was assigned to defendant Tom. In 2012, Tom served as WSPF's primary hearing officer for major conduct report disciplinary hearings, although there were other supervisors who sometimes heard conduct reports.

After being assigned to hear the conduct report about Kalafi, Tom approached his supervisor, Sweeney. Tom informed Sweeney that he and Shana Becker had a personal relationship outside of work, a fact that Sweeney already knew. (The record contains no other information about the relationship between Tom and Becker at that time, although it culminated in their 2015 marriage). Sweeney concluded that another hearing officer did not need to be assigned to Kalafi's conduct report because Tom was not involved in the incident or the investigation and he was WSPF's most experienced hearing officer. Moreover, Tom's primary

---

[5] Brown has submitted an affidavit in connection with the pending motions in which he now explains why Kalafi's statements were false. Dkt. 59. Kalafi has moved to strike the affidavit as a "sham" because Brown did not include these explanations in the conduct report. Dkt. 75. This motion is denied. Brown's affidavit explains his conduct report, it does not contradict it. Moreover, as explained later in this opinion, I find that Kalafi's statements are protected even if they were factually inaccurate.

duty was to hear conduct reports and he had demonstrated a high level of professionalism, integrity and ethics.

A disciplinary hearing was conducted on March 15, 2012. Tom was the hearing officer. Prior to the hearing, Tom denied Kalafi's request to call Becker and the district attorney as witnesses. Kalafi attended the hearing with an advocate. After the hearing, Tom found that Kalafi more likely than not had lied about staff. Disciplinary Hearing Decision, dkt. 46, exh. 5. Tom's hearing decision essentially restated the allegations made in Brown's conduct report. Like Brown, Tom did not explain why he had concluded that the statements in Kalafi's article were lies.

Tom's decision was reviewed by Sweeney. As security director, it was Sweeney's job to review all decisions made on conduct reports to ensure that they were supported by evidence. If a decision was not supported by the evidence, then Sweeney would recommend that the warden dismiss it or reduce the level of discipline imposed. In Kalafi's case, Sweeney believed the evidence supported Tom's finding of guilt and that the sanction Tom had imposed was reasonable.

Kalafi appealed Tom's decision to the warden's designee, Deputy Warden Hermans. Hermans reviewed Kalafi's appeal and the record from the hearing and agreed with Tom's findings and disposition, but determined that Tom needed to provide more reasoning for his findings. Accordingly, Hermans returned the disciplinary decision to Tom. In his amended decision, Tom explained that Kalafi's statement that WSPF has an "interest in keeping certain prisoners in their prison, in administrative confinement or just in segregation status, and these so-called doctors help WSPF by not acknowledging the clear mental problems of these prisoners

who may need treatment, not 24 hour confinement," was not accurate or correct. Tom did not find that any other statement in Kalafi's statement was inaccurate or incorrect. Amended Disciplinary Hearing Decision, dkt. 46, exh. V.

Warden Haines was not involved in the appeal process.

DISCUSSION

## I. Summary Judgment Standard

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## II. Warden Haines' Lack of Personal Involvement

Before addressing the merits of Kalafi's retaliation claim, I address briefly the question whether defendant Haines had any personal involvement in disciplining Kalafi for his article. As

defendants point out, Haines was the warden at WSPF, but he was not personally involved in Kalafi's disciplinary hearing or any appeals. It is a "well-established principle of law that a defendant must have been 'personally responsible' for the deprivation of the right at the root of a § 1983 claim for that claim to succeed." *Backes v. Village of Peoria Heights, Ill.*, 662 F.3d 866, 869 (7th Cir. 2011). There is no concept of supervisory strict liability under § 1983, *Harris v. Greer*, 750 F.2d 617, 618 (7th Cir. 1984); rather, a supervisor is personally responsible for unconstitutional conduct by underlings only if the supervisor knew about the conduct and facilitated it, approved it, condoned it or turned a blind eye to it. *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012).

Kalafi argues that Haines was personally involved because he emailed Becker about getting Kalafi's article removed from the Behind the Bars website. Plt.'s Br. in Supp., dkt. 44, at 7. As Kalafi admits, however, these emails were exchanged "months before plaintiff was issue[d] a conduct report." *Id*. There is no evidence in the record that Haines was personally involved in the issuance of the conduct report, the disciplinary hearing or in any of Kalafi's appeals.

Accordingly, because there is no evidence showing any personal involvement by defendant Haines, he is entitled to summary judgment on plaintiff's claims.

### III. First Amendment Retaliation

To establish a claim of retaliation, Kalafi must show that he engaged in a protected activity, he suffered a deprivation likely to prevent future protected activities, and there was a causal connection between the two. *See Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). The defendants acknowledge that Kalafi's

article was the reason he was disciplined, and they acknowledge that 180 days' disciplinary segregation was a loss of privileges that might reasonably deter similar speech. The only question that remains is whether the article found in Kalafi's cell was protected speech.

Kalafi argues that his article qualifies as protected speech under *Procunier v. Martinez*, 416 U.S. 396, 413 (1974). In *Martinez*, the Supreme Court considered the First Amendment rights of prisoners with regard to outgoing mail, holding:

> [C]ensorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

*Id*. at 413–14.

In *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989), the Supreme Court limited the holding in *Martinez* to outgoing mail, and applied the more relaxed standard set forth in *Turner v. Safely*, 482 U.S. 78 (1987)—that First Amendment restrictions on prisoners must be "reasonably related to legitimate penological interests"—to incoming mail. *See Koutnik v. Brown*, 456 F.3d 777, 784 & n. 4 (7th Cir. 2006) (reaffirming application of *Martinez* in outgoing mail claims).

Defendants argue that the court should apply the more lenient *Turner* standard in this case because Kalafi did not merely send his article outside the prison for publication, but he actually used the article *inside* the prison by showing it to Becker and taunting her with it. Courts recognize that prison officials have more leeway to censor or discipline a prisoner for disparaging

or inappropriate remarks contained in outgoing correspondence when the prisoner's intended reader is a prison employee or another inmate inside the prison. *Accord Leonard v. Nix*, 55 F.3d 370, 375 (8th Cir.1995) (upholding constitutionality of disciplinary action taken against prisoner who, in letter addressed to a former inmate, had written derogatory language and racial epithets aimed at and intended to be read by prison's warden); *Martin v. Rison*, 741 F. Supp. 1406, 1412–13 (N.D. Cal. 1990) (applying *Turner* to inmate's newspaper article that was published and redistributed back into the prison), *vacated as moot sub nom. Chronicle Pub. Co. v. Rison*, 962 F.2d 959 (9th Cir. 1992)). As Judge Conley observed in *Carter v. Radtke*, 10-CV-510–WMC, 2014 WL 549679 at *18 (W.D. Wis. Oct. 30, 2014):

> The reason for the differential treatment between incoming and outgoing mail makes sense: the relationship between inmates' speech *outside* of prison and the protection of prison security, order, and perhaps to a lesser extent, rehabilitation, is far more attenuated than speech occurring *within* the prison.

> (Emphasis in original).

An argument could be made that, insofar as Kalafi sent his article to a public website that he knew would or could be visited by his fellow inmates or staff at WSPF, the article constituted speech within the prison and *Turner* would apply, as the court found with respect to the newspaper article in *Martin*.

Defendants, however, do not present this argument. Indeed, they explicitly point out that they did *not* discipline Kalafi when prison officials first noticed the article on line in December 2011, Reply Br., dkt. 71, at 3. They insist that it was solely Kalafi's confrontation of Becker on January 13, 2012 that led to the conduct report. *Id*. at 5. The problem with *this* argument is that the charge actually brought against Kalafi says nothing about taunting Becker or the interaction

between him and Becker on January 13, 2012. The sole charge against Kalafi was making false statements in his article. Indeed, it is unclear whether Brown even was aware of the interaction between Kalafi and Becker when he issued his conduct report. If he was, he made no mention of it.[6] All Brown said in the conduct report about Kalafi's use of the article was that it had been posted on the Between the Bars website and seven more copies had been found in Kalafi's cell "to be sent out." Further, at no time during the subsequent disciplinary proceedings did any prison official allege that Kalafi taunted Becker with the article or allege that it was Kalafi's internal use of the article for which he was being disciplined.

What the evidence shows, then, is that defendants' professed concerns about Kalafi's "use of the article to confront [Becker]" are a post hoc attempt to justify their actions.[7] Because defendants have not advanced an alternative basis for applying *Turner*, I find that *Martinez* applies. *Accord Brooks v. Andolina*, 826 F.2d 1266, 1268 (3d Cir. 1987) ("Brooks was not disciplined for communicating with other inmates, but for the contents of his letter to a person outside the prison system. The *Turner* opinion, therefore, provides no support for the prison authorities' position.").

_____

[6] As evidence that it was Kalafi's use of the article inside the institution that led to the conduct report, defendants point out that Brown listed the date of the incident as January 13, 2012, which was the date Becker spoke with Kalafi at his cell. However, it is also the date Kalafi's cell was searched and the article was discovered. Brown's description of the incident refers only to the article's contents. He does not refer to anything that Kalafi said to Becker. Indeed, even in his affidavit submitted in connection with the pending motion, Brown does not identify "taunting" as the reason he wrote the conduct report and he does not say that the conduct report had anything to do with the fact that Kalafi confronted Becker with the article. Likewise, there is no mention of the Becker conversation in defendant Tom's disciplinary decision. Defendants' after-the-fact explanations fail to give rise to a genuine issue of fact as to why Kalafi actually was disciplined.

[7] I surmise that what the defendants actually were concerned about was that Kalafi still had copies of Becker's victim impact statement after it supposedly had been confiscated a month earlier. This concern was understandable and legitimate. But the defendants did not charge Kalafi with possession of contraband or any other rule violation that prohibited him from possessing it.

In *Martinez*, the court struck down a regulation that barred letters that "unduly complain," "magnify grievances," express "inflammatory political, racial, religious or other views," and matter deemed "defamatory" or "otherwise inappropriate," finding that this censorship was not justified by a legitimate government interest, like prison security and order. 416 U.S. at 413–16. Applying *Martinez*, courts have found that prison censorship of similar outgoing letters, or punishment based on those letters, violates a prisoner's First Amendment rights. *See, e.g., Loggins v. Delo*, 999 F.2d 364 (8th Cir. 1993) (affirming district court's finding that disciplinary action premised on letter to prisoner's describing a "beetled eye'd bit-back here who enjoys reading people's mail" and "[w]as hoping to read a letter someone wrote to their wife talking dirty sh—, so she could go in the bathroom and masturbate" violated prisoner's First Amendment rights); *Todaro v. Bowman*, 872 F.2d 43, 49 (3d Cir. 1989) (vacating district court's entry of summary judgment to defendant, finding fact issue as to whether prison retaliated against inmate for sending letters to the ACLU criticizing prison conditions); *Brooks*, 826 F.2d at 1268 (prison officials violated prisoner's First Amendment rights when they disciplined him for false and defamatory statements made about a prison guard contained in a letter to the NAACP)*; Hall v. Curran*, 818 F.2d 1040, 1042, 1045 (2d Cir. 1987) (finding genuine issue of material fact as to whether prison censored and retaliated against inmate based on letter to Amnesty International in which plaintiff "described physical abuse of prisoners"); *McNamara v. Moody*, 606 F.2d 621 (5th Cir. 1979) (finding a First Amendment violation for refusing to mail prisoner's letter to his girlfriend in which he described a prison employee "while reading mail, engaged in masturbation and 'had sex' with a cat"); *Gee v. Ruettgers*, 872 F. Supp. 915, 919 (D. Wyo. 1994) (denying defendant's motion for summary judgment where prison officials censored plaintiff's outgoing

communication containing false information about prison conditions sent to his family, because prison officials failed to explain how the letter threatened security or order).

Relying on these cases, Judge Conley found in *Carter*, 2014 WL 5494679, at \*4-5, that prison officials had violated Carter's First Amendment rights when they disciplined him for lying about staff based on statements he made in outgoing correspondence to a legal organization. Carter said things such as "While in Prison I've discovered the most large scale nepotism, selective hiring, racism, the beatings, electrocuting of black men daily by a clan of white openly racist close friends and family members. Deaths and abuse are rampant" and "These prisons are ran/operated by a clan of all white 100% openly racist close friends and family members on every level."  In response to defendants' argument that Carter's letters were not protected because he was lying, Judge Conley pointed out that the cases cited by defendants all concerned false statements in *internal* prison communications, not those contained in outgoing correspondence to a third party. As Judge Conley explained:

> Though defendants fail to acknowledge it, context matters. While the statements in Carter's letters to the two legal organizations may not be protected if made internally (whether to another inmate, in a letter to a prison official, in an internal grievance, or even if spoken to a prison guard), they are protected when sent in outgoing correspondence to a third party. Indeed, [*Martinez*] instructs that the content is protected even if it contains "unflattering or unwelcome opinions or factually inaccurate statements." 416 U.S. 396, 413–14.

*Carter*, 2014 WL 5494679, at \*17 (internal citation omitted).  *See also McNamara*, 606 F.2d at 624 ("Even if it is libelous, *Martinez* indicates that letters may not be suppressed simply because they are 'defamatory'.")

Without mentioning *Carter*, much less attempting to distinguish it, defendants in the instant case make the identical argument—and cite the same cases—that the court found unpersuasive in *Carter*, namely that Kalafi's statements are not protected under the First Amendment because they were false. Defs.' Opening Br., dkt. 50 at 9-12. Even if I were convinced (which I am not) that Kalafi's statements in his letter constituted "lies" versus matters of opinion, I am no more persuaded by this argument than Judge Conley was in *Carter*. As in *Carter*, 2014 WL 5494679, at *17, none of the cases cited by defendants in support of their position involve false statements made in outgoing correspondence; rather, they all concern false statements in internal prison communications. *See Hale v. Scott*, 371 F.3d 917, 919 (7th Cir. 2004) (holding that inmate's allegation in his inmate grievance of a rumor of sexual misconduct by a prison guard was not privileged); *Fitzgerald v. Greer*, No. 07–C–61–C, 2007 WL 5497185, at *2 (W.D.Wis. Oct. 3, 2007) (denying plaintiff right to proceed on a retaliation claim where he lied to health services about his medical status); *Madyun v. Smith*, No. 07–C–318–C, 2007 WL 2220259, at *10 (W.D. Wis. July 31, 2007) (citing *Hale*, warning plaintiff of the difficulty in proving retaliation in screening order, and stating that there would be no violation if he were lying because "such actions are not protected by the Constitution"). As discussed above, Kalafi's statements in this case were not used in an internal prison communication but were included in correspondence that, so far as the record shows, was sent or was going to be sent outside the prison. Under *Martinez*, his statements are protected even if they were false or defamatory.

The remaining question is whether defendants can meet *Martinez*'s criteria that would allow them to punish Kalafi for what he said in the article. To do this, defendants must show that: (1) their restriction on Kalafi's speech furthered an important or substantial government

interest—prison security, order or rehabilitation—unrelated to the suppression of expression; and (2) the limitation on First Amendment freedoms was not greater than necessary to the protection of the government interest involved.

In punishing Kalafi for the article, defendants relied on Wis. Admin. Code § DOC 303.27, which provides: "Any inmate who makes a false written or oral statement which may affect the integrity, safety or security of the institution is guilty of an offense." The rule exists because "Lying about staff can hurt the staff member and affect staff morale generally." Note to DOC 303.271. In finding Kalfi guilty of the conduct report, Tom explained that Kalafi's statements in the article affected the integrity of Becker and WSPF staff in general, and lowered staff morale.

Every prison has a bona fide interest in protecting the integrity and morale of its staff. Under *Martinez*, however, protecting staff integrity and morale is not a substantial enough interest to justify censoring (or imposing punishment for) an inmate's outgoing communications. Rather, prison officials must show that a regulation authorizing mail censorship "furthers one or more of the substantial governmental interests of security, order, and rehabilitation." *Martinez*, 416 U.S. at 413. *See also Carter*, 2014 WL 5494679, at *17 ("[*Martinez*] and subsequent cases, however, make clear that the 'integrity' of the institution is not a legitimate interest when censoring *outgoing* mail; rather any regulation or practice that censors outgoing mail must further prison security, order or rehabilitation") (emphasis in original).

Defendants have failed to show that their decision to punish Kalafi for the statements made in his article furthered these interests. While Kalafi's statements indisputably are (and were meant to be) offensive, particularly to Becker, the article does not contain threats of violence, escape plans or details of ongoing criminal activity. Indeed, defendants spend no time in their

response explaining how the article implicates WSPF's concerns for maintaining security and order. Although they frame their argument in terms of *Martinez*, defendants skirt the issue and instead argue that they would have taken the same action because it was really Kalafi's confrontation with Becker at his cell front that landed him in trouble, not the article itself. Reply Br., dkt. 71, at 7-8. If this argument presented an accurate recitation of what actually happened here, then this would be an entirely different lawsuit and the likelihood that the summary judgment ruling would flip in favor of the defendants would increase exponentially. But it does not. As discussed above, this argument flies in the face of the undisputed facts.

Accordingly, I am granting summary judgment in Kalafi's favor on his First Amendment retaliation claim. By punishing Kalafi for the contents of his article, defendants violated his First Amendment rights.

Further, defendants are not entitled to qualified immunity on this claim. Qualified immunity protects government employees from liability for civil damages for actions taken within scope of their employment unless their conduct violates "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Since *Martinez*, 416 U.S. 396 (1974), it has been unlawful for prison officials to censor or take disciplinary action against a prisoner for exercising his First Amendment right to communicate with third parties outside the prison unless necessary to further the interests of security, order or rehabilitation. Absent any showing by defendants that those interests were implicated in this case, they cannot claim that they reasonably believed that they were not violating Kalafi's rights when they punished him for his article.

This is not a finding that Kalafi's conduct was blameless. As addressed above, the defendants had other, more tightly-focused conduct reports they could have issued–and in hindsight wish they had issued instead–that would not have implicated Kalafi's First Amendment rights. But in this lawsuit they are stuck with the conduct report they actually issued, and that conduct report was unconstitutional.

## IV. Due Process Claim Against Tom

As this court explained in the order screening this case to go forward, an inmate like Kalafi who faces transfer to and confinement in segregation (as opposed to loss of good time credits) is entitled only to "informal, nonadversarial due process." *Westefer v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012) (citing *Wilkinson v. Austin*, 545 U.S. 209, 211-12 (2005); *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)). Although this right is informal, it includes the right to an impartial decision-maker. *Wolff v. McDonnell*, 418 U.S. 539, 592 (1974); *Pannell v. McBride*, 306 F.3d 499, 502 (7th Cir. 2002). Kalafi claims he didn't get one. He contends that defendant Tom, the hearing officer, was impermissibly biased because Tom was involved in a personal relationship with Becker at the time of the disciplinary hearing. In addition, Kalafi says Tom that should have recused himself because he authorized the search of Kalafi's cell on January 13, 2012 that led to the discovery of the article for which Kalafi was disciplined.

The contours of what constitutes impermissible bias with respect to a prison hearing officer are not well-delineated. As a starting point, adjudicators are entitled to a presumption of honesty and integrity, *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), and "the constitutional standard for impermissible bias is high." *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003). The

Court of Appeals for the Seventh Circuit has said that a prison official who is "directly or substantially involved in the factual events underlying the disciplinary charges, or the investigation thereof," may not adjudicate those charges. *Piggie v. Cotton*, 342 F.3d 660, 667 (7th Cir. 2003); *Whitford v. Boglino*, 63 F.3d 527, 534 (7th Cir. 1995) (per curiam). In addition, the court has *assumed* that a decisionmaker might be impermissibly biased if his spouse (or significant other) is a crucial witness in the proceeding, *see Eads v. Hanks*, 280 F.3d 728, 729 (7th Cir. 2002).

On the other hand, simply because an adjudicator is a "prison insider" with working relationships with other prison insiders does not disqualify him or her from sitting on a prison disciplinary committee. *Higgason v. Hanks*, 1998 WL 4741, *3, 134 F.3d 374 (7th Cir. 1998) (unpublished decision) (citing *Wolff*, 418 U.S. at 592) (Marshall, J., concurring in part) (constitution does not prevent "responsible prison officials" from sitting on prison disciplinary committee).

Applying these principles, Kalafi's claim has no traction until we get to Tom and Becker's personal relationship. Let's clear out the underbrush first: contrary to Kalafi's argument, Tom was not directly or substantially involved in the events underlying the disciplinary charge. It is true that he ordered the cell search that led to the discovery of the article, but he did so only in his capacity as the security officer on duty, not because he had any personal knowledge of what Kalafi had in his cell or because he thought Kalafi was violating prison rules. Further, Tom was not mentioned in Kalafi's article, he had not viewed it online when it was first posted, he did not issue the conduct report, he did not order it to be issued and he did not investigate it. Under these circumstances, Tom's involvement in the underlying factual events qualifies as "tangential" and did not preclude him from serving as the hearing officer on Kalafi's conduct report. *Accord*

*Gaither v. Anderson*, 236 F.3d 817, 820 (7th Cir. 2000) (rejecting argument that conduct adjustment board biased where board members had witnessed prisoner in possession of property he was later charged with stealing), overruled in unrelated part by *White v. Ind. Parole Bd.*, 266 F.3d 759, 768 (7th Cir. 2001); *Whitford*, 63 F.3d at 534 (signing a disciplinary report as shift supervisor is the type of "tangential involvement" that does not mandate disqualification); *Sprunger v. Smith*, No. 217CV00111-JMSMJD, 2017 WL 3421982, at *3 (S.D. Ind. Aug. 9, 2017) ("[K]nowledge of an investigation is not substantial involvement in the event or investigation itself.").

This brings us to Tom's relationship with Becker. As noted above, dicta from the court of appeals' decision in *Eads*, 280 F.3d at 729, suggests that a decisionmaker may be impermissibly biased if his spouse (or significant other) is a crucial witness in the proceeding. In *Eads*, the inmate alleged that a member of the disciplinary committee that found him guilty of disorderly conduct and revoked 90 days of good-time credit was the "live-in boyfriend" of one of the witnesses, a female guard. 280 F.3d at 728. At least one district court in dicta has parsed *Eads* as holding that it could be a due process violation if the hearing officer "had a relationship to the victim," or, "if the officer on the review board was engaged in an intimate, romantic relationship with one of the witnesses crucial to the prosecution." *Burrus v. Zatecky*, 2017 WL 5157858 (S.D. Ind. 2017). Several broad CALR sweeps have uncovered no other cases directly on point.

In the absence of decisive case law, let's resort to common sense: it just plain looks bad for Tom to preside over a disciplinary hearing in which one of the alleged victims is his girlfriend. Tom recognized the problem and sought guidance from Sweeney. Puzzlingly, Sweeney saw no need for Tom to recuse himself, noting simply that Tom had not been involved in the

investigation of Kalafi.  But that was only half of the story:  the charge to be heard was that Kalafi had lied about Becker, accusing her of being incompetent, unfair, mentally ill and a docile cog in WSPF's anti-prisoner machinery.  Sweeney did not consider how it would appear to outsiders that Becker's boyfriend was going to decide whether and how to punish Kalafi for publishing these smears.  So, Sweeney's lack of vision has put Tom on the hook in this lawsuit.

In *del Vecchio v. Illinois Department of Corrections*, 31 F.3d 163 (7th Cir. 1994), an *en banc* habeas corpus decision, the court noted in the context of a challenge to judicial neutrality at a state murder trial that

> Certainly the appearance of justice is important in our system and the due process clause sometimes requires a judge to recuse himself without a show of actual bias, where a sufficient motive to be biased exists.  . . .
>
> Despite the Supreme Court's broad pronouncements about "the appearance of justice," we cannot answer the due process question simply by concluding that it may have looked bad for Judge Garripo to preside at trial.  If the question truly is whether a defendant received a fair trial, bad appearances alone should not require disqualification to prevent an unfair trial.  What may appear bad to an observer, especially in hindsight, may not have influenced . . . the judge in his decision-making process.
>
> *del Vecchio*, 31 F.3d at 1371.

In his concurrence, Judge Easterbrook elaborated on this notion:

> An "appearance" of impropriety alone has never led the Supreme Court to find that a party did not receive due process of law.
>
> Our notions of proper judicial conduct are just that–ideas about *propriety* rather than about constitutional minima that everyone must accept. . . . Federal judges are free to, and should, expect more than the constitutional minimum from themselves, but we cannot insist that the states do likewise.
>
> *Id.* at 1392 (Easterbrook, J., concurring), emphasis in original.

*See also Bracy v. Schomig*, 286 F.3d 406, 425-26 (7th Cir. 2002) *en banc* ("in an earlier en banc opinion of this court . . . we held that a judge's mere *appearance* of impropriety does not render a judgement in violation of due process. . .. Appearances and suspicions are all that the court has going for it in this case," emphasis in original).

So how do we apply these notions to Kalafi's informal, nonadversarial prison disciplinary proceeding? Kalafi was entitled to an impartial decision maker and there is a strong presumption that Tom was impartial, but Tom's romance with alleged victim Becker provided the appearance of partiality. But the mere *appearance* of impropriety does not render Tom's conduct a violation of due process, so Kalafi is not entitled to summary judgment on this basis. To the contrary, it would seem that Tom is entitled to summary judgment unless Kalafi can point to facts from which a reasonable jury could find that Tom's relationship with Becker *actually* influenced the outcome of the disciplinary hearing.

Kalafi points to certain conduct by Tom that he contends is evidence of bias, but none raises more than a metaphysical doubt that Kalafi received a fair hearing. For example, Kalafi complains that Tom denied his request to call as witnesses Becker and the district attorney in the case for which Becker wrote the victim impact statement and that Tom did so without determining that either witness faced a risk of harm by testifying. However, neither of these witness's testimony would have been relevant. The question before Tom was whether Kalafi had lied about staff in his article, which Tom could determine simply by reading the article. Kalafi also complains that Tom "displayed bias" when he stated in his "reason for decision" that he had reviewed Becker's impact statement, but then later admitted that he did not have any victim's statement with him at the due process hearing. As defendants point out, however, simply because

Tom admitted he didn't have the statement at the hearing does not mean that he did not read the statement prior to or after the hearing. Finally, Kalafi insists that Tom was biased because he wrote that Kalafi's advocate "had nothing further to add" at the hearing, when in fact, the advocate said that he believed plaintiff was not guilty. Assuming that Kalafi's recollection of events is correct, it still fails to show bias: Kalafi insisted he was not guilty, so if the advocate repeated this point, then he really "had nothing to add."

In contrast, there is evidence in the record that counters any suggestion that Kalafi actually was denied due process. Foremost is the fact that the only statement that Tom actually identified in his hearing decision as being false was not aimed directly at Becker. Dkt. 46-22. The statement deemed false was the second one identified in Brown's conduct report, namely, Kalafi's statement that WSPF had an "interest" in keeping certain prisoners in their prison and that the psychological staff helped to further this interest by failing to acknowledge prisoners' mental problems. Tom found this was false, noting that WSPF psychologists regularly meet, test and screen inmates, provide them with individual therapy, refer them to programs within the prison to work their way to a lower security prison, or refer them to other facilities for necessary treatment. It is impossible to conclude that Tom would have reached a different conclusion even had he not been involved in a personal relationship with Becker. Discerning the truth of Kalafi's statement was something that Tom was able to do based on his role as a security officer with working knowledge of the prison and its staff; it did not require him to evaluate whether Kalafi or Becker was telling the truth. Under these circumstances, the risk that Tom's decision was influenced by his relationship with Becker is negligible.

Two other facts tend to counter any suggestion of actual bias. First, Tom imposed only half of the authorized penalty, ordering Kalafi to serve 180 instead of 360 days' segregation. Second, after the hearing, Tom's findings were reviewed by both Sweeney and by Deputy Warden Hermans, who upheld Tom's decision after Tom had amplified his factual findings. Although neither of these facts is conclusive, Tom's lenience and the affirmance of his decision by his superiors, together with the fact that Kalafi was not disciplined for his statements aimed directly at Becker, indicate that Tom gave Kalafi a fair hearing. Put another way, there are no facts that would support the conclusion that a different hearing officer would have reached a different result or imposed a different penalty.

In sum, while there is ample room to second guess the prudence of keeping Tom on the case, there is insufficient evidence to overcome the strong presumption that Tom adjudicated Kalafi's case fairly. Because no reasonable fact finder could find from this evidence that Kalafi was denied a neutral decision maker, Tom is entitled to summary judgment on this claim.

## V. Next Steps

In this case, there is no need to hold a hearing on the appropriate injunctive relief because Kalafi clearly is entitled to expunction of the DOC 303.27 I violation from his disciplinary record. Under 18 U.S.C. § 3626, injunctions in civil actions brought by prisoners "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." Because defendants violated Kalafi's First Amendment rights by disciplining him for the content of his article, correcting the violation requires removing the conduct charge from Kalafi's record.

All that remains is the question whether Kalafi may recover damages.  Kalafi bears the burden of proving any losses he sustained.  *Memphis Community School District v. Stachura*, 477 U.S. 299 (1986).  42 U.S.C. § 1997e(e) prevents Kalafi from obtaining damages for any emotional pain and suffering, *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003), and it seems unlikely that he suffered any economic harm as a result of his placement in segregation.  Thus, the likelihood that Kalafi will be able to prove economic damages is low.  If he cannot prove economic damages, then he would be limited to recovery of $1 in nominal damages.

Kalafi also may be able to recover punitive damages, but to do so he will have to prove that a defendant acted with "evil motive or intent" or with "reckless or callous indifference" to his First Amendment rights.  *Smith v. Wade*, 461 U.S. 30 (1983).  "Punitive damages are never awarded as a matter of right; the finder of fact, after reviewing the entire record, is called upon to make a 'moral judgment' that the unlawful conduct warrants such an award to punish the wrongdoer and deter others."  *Merriweather v. Family Dollar Stores of Indiana, Inc.*, 103 F.3d 576, 582 (7th Cir. 1996) (quoting *Smith*, 461 U.S. at 52).  At a trial, the jury would be given the following instruction on punitive damages:

> You may assess punitive damages only if plaintiff has proven that defendant's conduct was malicious or in reckless disregard of plaintiff's rights.  Conduct is malicious if it is accompanied by ill will or spite, or is done for the purpose of injuring plaintiff.
>
> Conduct is in reckless disregard of plaintiff's rights if, under the circumstances, defendant simply did not care about plaintiff's rights.

Before convening a jury, the court will order Kalafi to submit a proffer detailing:  1) the evidence he intends to submit to establish that he suffered economic loss as a result of the unlawful disciplinary charge; and 2) the evidence he intends to submit to show—with respect to

each remaining defendant—that the defendant's conduct was accompanied by ill will or spite, or was done for the purpose of injuring plaintiff. Kalafi's evidentiary proffer is due by April 26, 2018. Defendants may have until May 17, 2018 to respond. If Kalafi's evidence fails to establish economic injury or a material question of fact regarding aggravating circumstances or the reckless or callous nature of the defendants' actions, then the trial shall be cancelled as unnecessary and the court will order the defendants to pay Kalafi $1 in nominal damages. *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999).

ORDER

IT IS ORDERED THAT:

1. Plaintiff Kalafi's motion for summary judgment, dkt. 43, is GRANTED IN PART and DENIED IN PART. It is granted as to his First Amendment retaliation claim against defendants Becker, Brown, Tom and Hermans. It is DENIED with respect to his First Amendment retaliation claim against defendant Haines and with respect to his Due Process claim against defendant Tom.

2. Defendants' motion for summary judgment, dkt. 49, is GRANTED IN PART and DENIED IN PART. It is DENIED as to plaintiff's First Amendment retaliation claim against defendants Becker, Brown, Tom and Hermans. It is GRANTED in all other respects.

3. Not later than May 17, 2018, defendants shall expunge the DOC 303.271 violation from Kalafi's disciplinary record.

4. Not later than April 26, 2018, Kalafi shall submit a detailed proffer of: 1) the evidence he intends to submit to establish that he suffered economic loss as a result of the unlawful disciplinary charge; and 2) the evidence he intends to submit to show—with respect to each defendant except Haines—that the defendant's conduct was accompanied by ill will or spite, or was done for the purpose of injuring plaintiff. Defendants shall have until May 17, 2018 to file a brief in response.

5. If necessary, trial on the issue of damages shall be held on June 4, 2018, as scheduled in the court's pretrial conference order, dkt. 20.

Entered this 5th day of April, 2018.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge